Before the clock starts running, I just want to give counsel a heads up. Mr. Coyte, you've asked for six minutes, so at nine minutes, the tone is going to chime, and I'll let you know in case you're deep into answering a question and don't notice it. But any time after that, you're going to be eating up your rebuttal time. And Ms. Coella and Mr. Sauer, you know, you've got that 15 minutes. You can do with it as you please, but at the end of the 15, when that tone chimes, somebody's going to have to wrap up. Okay? Everybody understand? Yes, Your Honor. This is Mr. Coyte. Thank you for the clarification. Okay. Ms. Coella and Mr. Sauer? Yes, I understand. Continue, Your Honor. Okay. This is Mr. Sauer. I understand as well. Okay. Thanks. Let's get the clock running and get going. May it please the Court, good morning. Brian Coyte for the Ethics and Law Group on behalf of Uniloc. The Board erred in construing the term glitches to encompass the errors described by McMahon, and I want to raise three brief points. I'm first talking about the 1599 case. Mr. Coyte? Yes? This is Judge Wallach. You're going to need to listen for when the judges talk, okay? Okay. Okay. I have a few questions, given the short amount of time that you've allotted yourself. Sure. I want to get going on them. On page 17 of the red brief, Apple says, quote, there's no implicit or explicit requirement that glitches be limited to accurate motion sensor data. This is a yes or no. Do you agree with that assertion? Let me – hang on. Let me turn to that, Your Honor. No, Your Honor. I mean, this is where they're talking about the indicative could be – I think the patentee was very clear. You're going to need to listen. Okay, that was a no. So since you said no, where in the patent does it explicitly or implicitly require that glitches be limited to accurate motion sensor data? Give me the language. It doesn't explicitly say, but as Your Honor is probably aware, the case law doesn't require an explicit redefinition. Like, photography doesn't call it something explicit. That's in something like the trustees of Columbia University, which is a – Give me the language. Give me the implicit language in the patent. Okay, the claim language itself first talks about motion data, that it's obviously motion data, the first instance. The motion data includes one or more glitches, removing the glitches. So syntactically, if the claim language is motion data, it must be something motion. Now, to address your specific point about whether it's accurate, that's addressed in Column 1, Lines 61 to 63. It talks about whether the device is woken up from the state if the motion data points to the motion being real, as opposed to mere jostles or glitch. Again, the qualification real is showing that everything that's being discussed in that is relating to motion. So it's things that are accurate. It's things that they're thinking that are actually there, as opposed to something that's beyond the range of the operational range of the sensor. On pages 13 to 17 of the blue brief, without citing any legal authority in those pages, you argue that the board erred in construing a glitch to encompass McMahon's error. Do you have any legal authority for that? It seems to me it's just pure attorney argument. I think the legal error is what I referred to earlier. This is what the board said. I think what you're referring to is this is on Appendix 8. None of the passages of the patent owner's sites actually refers, they use that word, to jostle motion data as a glitch. The legal error, Your Honor, is that they were looking for an explicit statement saying, you know, a glitch is that. But again, the trustees of Columbia University case, which I referred to, which for the record is not cited in our brief, but I think it's on point, talks about a patent applicant need not expressly state, my invention does not include X to indicate his exclusion of X, because the patentee's choice of preferred embodiments can shed light on the intended scope of the claim. And that's what we're arguing here. You can look at the preferred embodiments, which are discussed in Column 1, 61 to 63, and Column 4, 61 to 62, to understand that the glitch is in the context of real motion. I mean, it's something that's in contrast to real motion, and that jostle, bump, and glitch are all interchangeable. It's the currency of motion that's describing that. Mr. Coide, I want to move you along. On page 17 of the blue brief, again, without providing a legal standard, you assert, the board misconstrued the scope of Substitute Claim 23, however, in finding that Pasolini and Fabio teach a power logic to move the device from the inactive state to an active state upon detection of change in the dominant axis, which is the axis experiencing the largest effect of gravity. Isn't that a claim construction argument? It is, Your Honor, and that's what we're saying. We're saying there's a claim construction argument in error in both of the 1699 and the 1801 matter. Did you not decline to make a claim construction argument before the PTAB? I'm sorry, Your Honor, you blanked. I think maybe it might have been my line, but I didn't hear your full question. Would you repeat that one more time? You bet. Did you not decline to make a claim construction argument before the PTAB? We did, Your Honor. We took a plain and ordinary meeting, but as Your Honor is probably aware, that often the board nevertheless, in application of its analysis, implies a construction, and that's what happened here. So we did take that position, but in the application, they ended up doing construction, which we are now disputing. Okay. Let me just try one shot at that. In the green brief on page 47, the PTO says that your, quote, claim construction argument for a change in the dominant axis was not clearly articulated before the board. Show me in the record where you clearly and specifically argued it. Okay. At Appendix 2584, we stated Petitioner leaves undisputed, uniloxed reasoning as to why merely detecting a change along the vertical axis does not disclose what the original claim language explicitly requires. Also in 2530 to 31, I'm sorry, of the appendix, we also said merely detecting a change along the vertical axis does not disclose what the claim language requires, i.e. detection of a change in the dominant axis itself as expressly defined in the claim language. I mean, part of this issue arose because we made certain arguments, and as we laid out in our brief, the board kind of just gave short shrug to them. They kind of mischaracterized what our arguments are, and then we're left with, you know, we're pointing to where we tried to preserve them, and we think we did. Okay. Go ahead. Okay. Well, Mr. Coyney, this is Judge Chen. Do you know what – how would you define the ordinary meaning of glitch? Well, Judge Chen, as you're probably aware, the parties below agreed that there's actually a special meaning, a lexicography here. Well, let's start with what do you think is the ordinary, regular meaning of glitch? A malfunction. It wasn't a malfunction in the system. You know, I don't know how to really respond to that, Your Honor, because – Did you ever see The Matrix? The movie The Matrix? I did see The Matrix, Your Honor, and I had thought of that. Okay. You remember a glitch in The Matrix then, right? Right. But actually, if we're going to talk about plain ordinary meaning, and I will engage, Your Honor, you know, there must be something – you know, that's why I – if glitch were just to mean error, then why would they choose such an unusual word as glitch? I mean, they're really – the Scribner here was really trying to capture what we're saying as this particular motion that's outside the range of normal human operation. Errors are very common. What about column 3, line 36? The glitches generally are indicative that the accelerometer or sensor is malfunctioning. Hang on, Your Honor. That's column 3, line 36. Okay. Yes, I see it, Your Honor. Then there's column 3, line 28. In one embodiment, the glitch-correcting logic 235 discards any abnormal accelerometer readings. Okay, Your Honor. Let me just address both of those. And then, you know, there's another one at line 23 of the same column 3. In one embodiment, glitch-correcting logic 235 further may be used to discard non-human motions. Okay. So this all feels really right in line with the ordinary meaning of glitch. Your Honor, if I could respond. I'll try to just briefly respond. But the – in all of those instances Your Honor referred to, they're talking about a special circumstance where there are multiple glitches, multiple, you know, sensing of movement being outside the normal range. And then, you know, for instance, like if you were to have one sense of it being outside the normal range, like the device gets dropped from a desk and it goes something outside the normal range of a human picking it up, that would be something that's just one glitch. What they're talking about here is multiple glitches. You get like 20 glitches in one second, 20 instances where you're thinking the thing is being dropped. Then it might be indicative of a sensory malfunction. Can you point me to something that says that? I don't read that. I mean, I read that in – I just read the word malfunctioning. No, I read that if you look at – if you look at – respectfully, if you look at the paragraph that you're referring to, such as like column 3, lines 28 to 36, it's talking about where there are multiple glitches. I'm sorry. I'm sorry. This is a column starting at 15, the prior paragraph, column 3, 13 to 26. It's talking about multiple glitches and then having that then create an issue where it might be a malfunction. It's not talking about one glitch. So that's a special circumstance where there are multiple glitches. For the – I will try to preserve the remainder of my time for rebuttal at this point. Go ahead. Let me hear from the AP police. You're up. May it please the court. Abby Colella on behalf of APPLE. As the board correctly recognized, the claim term glitch must at least encompass erroneous sensor reading. As you noted, the specification consistently equates glitches with erroneous readings. It provides, for instance, that glitches are abnormal data, that glitches indicate a sensor malfunction, and that glitches occur when a sensor reading is unlikely, if not impossible, to be correct. And that's not just something that occurs when there's multiple glitches. If glitches are accurate sensor readings of things like jostles and bumps, as Unilocks construction would require, then there's no amount of glitches that would signal a problem with the sensor. It would just accurately indicate that the user is jostling their phone a lot. In light of those disclosures, Unilocks narrow construction is not viable. To be clear, glitches may include accurate measurements. The board's construction allows for that. But there's nothing in the specification that could possibly limit glitches to that category, as Unilocks suggests. Unless your honors have any questions, we ask that this court affirm the decision of the board. Thank you. Thank you. Let me hear from the government. Good morning. May it please the court. Peter Stalwart on behalf of the USPTO Director. In each of these appeals, Unilocks' request to vacate the board's findings of obviousness turns on the construction of a single claim term that is subject to de novo review by this court. The sole issue in the 1699 appeal is the construction of the term glitches, as found in the second limitation of Representative Claim 1 of the 646 patent. The key passages that both define the term glitches in the specification consistent with the board's construction are at Columns 3, Lines 13-16 and Columns 6, Lines 35-38. And other multiple passages, as has already been pointed out by Judge Chen and by Counsel for Apple, support that construction. And there's simply nothing in the claim language that contains the term glitches to limit that term to something less than what is fully described and disclosed in the specification. The sole issue in the 1801 appeal is the construction of the claim limitation, a change in the dominant axis, as found in Proposed Amended Claim 23. As has already been raised in questioning by Judge Wallach, the government does not believe that this argument was adequately raised or preserved before the board. Even if it were, it's simply directly counter to the disclosure of the specification. At Appendix, Page 74, Column 4, starting at Line 12 and going to Line 24, is the passage that directly contradicts the construction that Uniloc advocates here. In the preceding portion at the bottom of Column 3, starting at Line 38 and going to the top of Column 4, the 646 patent describes a number of different ways that accelerations may be tracked and used to assign a dominant axis. Then, moving to the passage I referred to, beginning at Column 4, Line 12, the 646 patent discloses that if the prior and current dominant axes are the same, the computation logic 255 determines if the long average has changed by more than a predetermined threshold. One embodiment, when the change in the dominant axis, there we have the very precise limitation as that issue here, is larger than the threshold value, the computation logic 255 communicates with the power logic 265 and the device state logic 270 to power up the device and restore the last active state. If the change in the dominant axis, that's the same claim limitation again, is not larger than the threshold value, the device is maintained in the idle state. Again, that entire portion of the specification is premised on the fact that the current and prior dominant axes are identical and with that condition in place, it describes a change in the magnitude of acceleration along the same dominant axis as a change in the dominant axis as claimed. This is also consistent with the discussion of Figure 5 in the specification. Figure 5 is a flow chart for determining whether to wake up a device from an idle state. Figure 5 is described on Appendix 75 and Figure 5 itself appears on Appendix page 70. Figure 5 shows that if either the direction of the dominant axis has changed at Block 535 or if the axis remains the same and the magnitude of acceleration along that axis exceeds a threshold at Block 540, then the device will be woken up from the idle state at Block 545. Once again, there is nothing in the written description of the 646 patent or the claim language itself to support importing a negative limitation to a claim term that has been described more broadly in the specification. The Board correctly construed a change in the dominant axis to allow a change in magnitude of acceleration along the same dominant axis or a change to the direction of the dominant axis. Because Unilock's only arguments for overturning the Board's decisions turn on improper claim construction arguments, we respectfully request that the Court affirm the Board's decisions. If there are no questions from the panel, I would yield the remainder of my time. Well, thank you very much. I believe, Mr. Coide, that you have some rebuttal time. Thank you, Your Honor. I want to turn to the 1801 case. The claim language of 23 recites detection of a change... Mr. Coide, before I forget, the Arthrex challenges, those are gone now, right, in light of your letter from a couple weeks ago? Yes, Your Honor. We're just focused on the claim construction issues of change in dominant axis and glitch. Is that right? That's correct, Your Honor. We are no longer seeking remand under Arthrex. Okay. Thanks. Please continue. Okay. Thank you. So turning to the 1801 appeal, the claim recites detection of a change in the dominant axis, which is the axis experiencing the largest effect of gravity. An axis itself doesn't have any value. It's just an orientation. Moreover, Claim 23 doesn't recite change in the magnitude or change in the value, but the dominant axis. It's reciting change in the dominant axis itself. And there's no doubt that the claim language itself means a change in the axis, because the claim language, starting with the which language, which is the axis experiencing largest effect of gravity, is telling you what that change means. This comports with the written description, which distinguishes between two things. First, a change in the dominant axis of the device and the level of acceleration beyond a threshold. That's discussed at the blue brief at page 17 where we cite the appendix. Mr. Coyne, before you run out of time, I think you need to answer for Claim 7. Because if we just assume for the moment that we need to construe this term, a change in the dominant axis, consistently throughout all of the claims, and we see a dependent claim defining a change in dominant axis in a particular way to include a change in acceleration along the dominant axis, why doesn't that require an affirmance of the board's decision here? Yes. Thank you, Your Honor, for that question. I wasn't planning to hit that. I think the difference is the director is arguing that Claim 7 is reciting a genus-species relationship. So they're arguing that we're in the change in the dominant axis comprises, and then, therefore, the change in acceleration along dominant axis is kind of a subset of that. We think properly what Red is saying, not saying that. It's saying we're in the change in the dominant axis comprises, so you already have a change in the axis itself. And then there's also, coincident with that, a change in the acceleration along the dominant axis. It's not saying, okay, one subset of the change in the axis language comprises, okay, it has to be the subset of change in acceleration of dominant axis acceleration. So that's our – I think that probably puts a finer point on where the dispute is there. Okay. Let me just turn to – so, again, there are two different concepts. I think that's beyond dispute. There's a change in the dominant axis device and a change in the level of acceleration beyond a threshold. The detailed description goes into discussing, we noted in our blue brief at 17 and 18, the change in the dominant axis itself. We talked about a new axis, and there's ample description of that, a new axis being selected. The portion that the director just referenced, this is in their brief at page 31. They cited it to a block quote of columns 4, 12, lines 12 to 24. That part – I'll just finish up. That part actually supports the second embodiment, and so it actually helps us. It's just a – it's a disclosed but unclaimed embodiment with respect to claim 23. Thank you, Your Honor. We appreciate consideration of this – of our appeal. Thank you. The matter will stand submitted.